GOODLIN et al. v. HUTSON et al.

Eastern Section.  December 19, 1931.

Petition for Certiorari denied by Supreme Court, May 5, 1932.

Bowen & Bowen, of Knoxville, for plaintiffs in error.
Steinmetz & Lowe, of Knoxville, for defendants in error:

SNODGRASS, J.   Suits to recover the value of property lost in a fire which occurred at 510 West Hill avenue, Knoxville, in a rooming house belonging to defendants, about one o'clock a. m. on January 26, 1929.   Originally there were nine cases heard together, but only five of them have found their way to this court, and these are the cases of Mary E. Goodlin, who sued the defendants for $436; C. M. Hall, who sued for $751; Sidney Hall, who sued for $952.74; John Gorman, who sued for $1,603; and M. S. Farrell, who sued for $899.40.

One of these cases, that of Mary E. Goodlin, originated before a justice of the peace and was brought into the circuit court by appeal, where it, with the others mentioned, which were brought in the circuit court, were heard together, resulting in the dismissal of all of them by the circuit judge, who heard them without the intervention

of a jury. A jury was at first demanded, but the demand was abandoned, and the cause restored to the nonjury docket.

Plaintiffs were tenants of defendants, and liability in all the cases was predicated upon alleged negligence. The grounds stated were substantially as follows: Plaintiffs averred that said fire was caused by the willful negligence of the defendants, on account of their failure to provide proper and safe electrical wiring for said premises, and it was averred that said fire was caused by defective and exposed electric wires running through and into said property, which wires were heavily charged with electricity, and all of which exposures and defects were known to defendants, or should, by the exercise of due diligence, have been known to defendants; and plaintiffs averred that, on account of the willful negligence of the defendants, they suffered the loss set out in each case and for which they sued.

Pleas of not guilty were interposed to the circuit court cases, and, while the allegations in the warrant were less specific, that was the defense made to it also.

Upon the proof considered, the circuit judge dismissed the cases as indicated, and, after motion in each case for a new trial was made and overruled, they were all brought to this court upon the oath prescribed for such persons, and errors have been assigned as follows:

I. The court erred in declining to permit plaintiffs to prove the defective condition of the electric wiring of the house in question prior to the date of the purchase of said property by the defendants.

II. The court erred in declining to permit plaintiffs to show that the wiring at the time of the purchase of said property was defective, that said defects were well known to defendants, or ought by due diligence to have been known to them, and that said condition was in existence prior to the time of the purchase of said property by the defendants, and remained unchanged up to and including the night of the fire in question.

III. The court erred in refusing to hold that under the proof in these cases the doctrine of res ipsa loquitur was applicable, and that the burden of proof was on the defendants to show that said fire was caused from some source other than the defective wiring, or that said fire was not caused by said defective electrical wiring.

IV. The court erred in dismissing plaintiffs' suits and taxing the plaintiffs with the costs; and should have rendered judgment against the defendants for the full amounts sued for and all costs.

The first two assignments are too general. They manifestly relate to the rejection of evidence, and are not in conformation to the rules requiring, not only the citation to the pages of the record, but the quotation of the full substance of the evidence rejected.

The third assignment can be considered in connection with the

fourth, which deals with the merits of the case. But from the mere fact of a fire we do not think the doctrine contended for would apply, and the burden would still be upon the plaintiff to make it appear, which they undertook to do, by a preponderance of the proof, that the fire was due to the negligence of the defendants; that is their allegation, and we think it must be so proven.

Before taking up the fourth assignment, however, it is proper to dispose of a motion filed by the defendants to dismiss the appeal of John Gorman and M. S. Farrell, because it is insisted that they appear to be nonresidents who are not entitled, under Shannon's Code, section 4928, to thus prosecute appeals under the pauper's oath. With reference to John Gorman, the only proof of alleged nonresidence is that he appears to have taken the pauper's oath which he filed to perfect his appeal before a notary public in the state of Ohio. Defendants do not support their motion as to him with any affidavit that he was or had become a resident of Ohio. It was charged in his declaration that he was a resident of Knox county and a tenant in the building that was burned, wherein it was alleged that he had suffered a loss. Moreover, the pauper's oath had been originally filed to enable him to bring his suit, and no question was made in the lower court as to such a right. He may have had to be in Ohio temporarily under circumstances requiring him to subscribe to the oath there. We do not think the question as made sufficient to require any rule to be made upon him, and to this extent the motion is overruled as to him. It does appear from the deposition of M. S. Farrell, whether before bringing the suit or not, that during its pendency at least he had become a resident of New Orleans, Louisiana, and, until shown otherwise, the presumption would be that he so continued, and that at the time he filed the oath in lieu of an appeal he was not authorized to do so. The motion therefore will be sustained as to him, and, unless a bond is filed within five days as to him, his appeal will be dismissed on that ground.

As to plaintiff Gorman, however, there is no proof showing what, if any, losses he has sustained, and, even though it should be found that defendant's negligence was the cause of the fire, he is without proof showing any loss. A diminution of the record was suggested, but there is no return here by the clerk in response thereto justifying us to take any other course than to concur with the circuit judge in dismissing the case as to him.

It would appear from statements of counsel that a deposition had been filed in the cause within the time allowed to file proof of loss, and that the same is lost and cannot be supplied, but there is a statement in the bill of exceptions that the evidence copied therein was all the evidence in the case. The claims of the other defendants were es-

tablished as set up, entitling them to a judgment if there is a liability upon the merits of the case.

Before the defendants became the owners of the property, it was shown that the electric wiring was negligently allowed to become in a dangerous and threatening state. Insulation on the wires had worn off in the basement and in one of the rooms at least in the upper stories. Mr. Dossett, a student in the University, lived there and occupied this room. He stated that, where the wires came into the room over the door, the insulation was worn off and it smoked, and that he wrapped the wires with tape. There was a fire in the winter of 1927 or spring of 1928 that this witness testified to, and there was abundant evidence, we think, that previous to July, 1928, before these defendants owned the property, it was allowed to become dangerously liable to catching fire from the condition testified to by Dossett as it related to the wiring in the upper stories. But Dossett testified that the wire in his room was or became inclosed or insulated. The insulation became worn off in the basement, wires were allowed to sag upon the water and gas pipes, forming an arc, and it was shown that this was the condition in the basement when the defendants bought the property and became owners in July, 1928.

So the circumstances of its condition before July, 1928, when defendants came into possession of it, become merely cumulative, as it was shown by direct proof that the basement was in as dangerous a condition after these parties got it as it was before, and that they had notice of it. After defendants became possessed of it in July, 1928, Mrs. Margaret Mynatt was employed to run the house for defendants, and during her absence Bonnie Johnson acted for her. She testified as follows:

"Q. State whether or not you notified Dr. Hutson there on any occasion anything with reference to his lighting conditions. A. I called the office once for a man to come down; that was after I got to the store where I work, S. H. George & Sons, and then called Dr. Hutson.

"Q. What did you say to Dr. Hutson? A. I told him they would have to fix them or we were going to burn up.

"THE COURT: What did you say?

"THE WITNESS: I told him there was something wrong down there, they would burn, I mean a blaze would flash from the wires, and I asked him to send some one down to correct it.

"Q. What did he say? A. He said to phone the man to come down.

"Q. Who did you phone? A. I phoned the department for a service man to come down.

"Q. Did he come? A. I wasn't there; they said he came.

"Q. What was the occasion for your calling Dr. Hutson? A. They were glaring, I call it.

"Q. Where? A. In the basement, the insulation was off.

"Q. How close to the ceiling in the basement? A. I guess, perhaps, three or four feet. Those wires ran straight across, not up high.

"Q. Where were those wires in connection with Mrs. Goodlin's apartment? A. Right under her apartment.

"Q. Where were they with reference to this pantry and dumb elevator they have testified about? A. Oh, a good ways, I will say four or five feet.

"Q. Was that the only occasion you ever called Dr. Hutson up? A. Yes, that is the only occasion I ever called him myself, the one time.

"Q. Did you ever see any one down there at the house fix the lights or undertake to fix them? A. Mr. Miller would come up and fix them when they went out at night.

"Q. Who was Mr. Miller? A. The man that stayed in the basement and took care of the furnace.

"Q. Was he an electrician? A. I don't know.

"Q. Were you in the basement frequently? A. No, maybe once a week, or once every two or three weeks.

"Q. Did you have occasion to observe the light wires in the basement? A. Sure.

"Q. What condition did you find them in? A. The insulation was off quite a few of them in a number of places.

"Q. How long was this, now, before the fire? A. Well, I will say it was, I presume it was in August.

"Q. In August before the fire in January? A. The fire in January."

The witness further testified on cross-examination that the time she telephoned Dr. Hutson was not the only time she knew that anything was wrong with the wires; that it was there to see when you went down; that it was glaring, and, while you did not see fire every time you went down in the basement, she saw it more than one time. She, however, did not telephone Dr. Hutson but the one time. So that there can be no doubt but what the owners of the property were affected with actual notice of the dangerous character of the wiring after they came into possession of the property, its condition while owned by others being merely a circumstance tending to show this fact, and becoming immaterial when actual notice is shown by the warning of their agent. Indeed, they do not deny this, but attempt to show that this condition was remedied by the electrical contractor, one Briscoe.

We are of opinion that the weight of the proof is that there was a correction made of the wiring by Mr. Briscoe in so far as it affected

the basement. The gas pipe which the wires were sagging upon or near had been taken down, and dangerous wires cut and all loose wires taken down and the matter corrected, but, whether this was so or not, it appears abundantly in the proof, we think, that the fire did not originate in the basement, but rather from the proof that it originated in between the ceiling of the basement and the floor of Mrs. Goodlin's room or in the pantry, the walls of which ran up by her bed, which was also near the dumb elevator that ran from the basement to the top floor or the attic of the building. The furnace flue also ran up in proximity. An unusual fire in the furnace had been banked about 8:30. On one of the upper floors in one of the rooms that had been occupied by students it was found after the fire that there was a considerable hole in the chimney that had been covered by a wooden plank and papered over, but we think the weight of the proof indicates that the fire originated lower down, either between the ceiling and floor of Mrs. Goodlin's room or in the pantry, the walls of which went up by her bed as indicated.

While the proof does not show whether she had had any fire in that room that day, her cooking utensils were in this pantry, and it also had electrical wiring in it. The wires came into the house in a pantry or small kitchenette about eight or ten feet away from this place, and the proof shows that on the 26th day of October, 1928, Blankenship, of Knoxville Power & Light Company, had been called to the house and found trouble with the meter. He stated that he found the wiring in bad condition and a bad connection in the meter loop, which he stated was the cause for the meter not registering. He was asked:

"Q. Now, the meter loop, Mr. Blankenship, is that what Mr. Wardell probably called a while ago the meter switch? A. It is the distribution, where the current comes in and is distributed all over the house.

"MR. MITCHELL: Is it the meter box on the back porch?

"THE WITNESS: Same thing, yes, sir.

"Q. You say the meter was not registering? A. Yes sir.

"Q. What causes that? A. Where it is overloaded, becomes crowded, due to overloading the wires, would not make connection.

"Q. Did you find any overloaded wires when you were there on that occasion? A. Yes.

"Q. Where? A. I didn't trace the connection to see where they went to, I just found beyond the meter, inside the house.

"Q. How about the insulation on the wires? A. Well, the insulation on the wires was rather old and dry."

He did not go down in the basement, but reported the meter box to his superior. He stated that Mr. Wardell was down there and corrected that after this inspection, and, if he is correct as to this, every specific defect that was shown in the proof to have existed was

shown to have been remedied, and we simply have that on the night of the fire, January 26, 1928, the fire originating in the ceiling of the basement, between the floor and coming up heating the walls of the pantry beside the bed of Mrs. Goodlin, and therefore must have originated in a concealed place where inspection was not available, and just what produced it is not removed beyond the realm of conjecture. No matter how negligent defendants may have been shown to be in matters that may have been corrected, the negligence proximately causing the fire must be shown, and this, we think, is the fatal infirmity of the proof. The owners lost, all lost, and each must bear his own misfortune.

The assignments of error are therefore all overruled, and the judgment of the lower court is affirmed, with costs against appellants.

Portrum and Thompson, JJ., concur.